IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION
JUDGE NORMAN K. MOON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 6:14-cr-00009-1 |
| v. | |
| LINDA SUE NEWCOMB | |
| UNITED STATES OF AMERICA, | CASE NO. 6:14-cr-00001-1 |
| v. | |
| TERESA WIERINGO HUMPHRIES | |

**MEMORANDUM OPINION**

Criminal judgments have been entered against the above-referenced defendants. One of the victims, the National Credit Union Administration ("NCUA"), requested that I order pro rata distribution of the restitution proceeds. The government entered a recommendation in support of the NCUA's request. Another victim, Northern Piedmont Federal Credit Union ("Northern Piedmont"), asked that I decline to order pro rata distribution. At Ms. Newcomb's sentencing hearing, I stated that I would issue a memorandum regarding the priority of distribution of restitution between the victims, and I also stated that the payment of restitution to Cumis Insurance Society, Inc., would be subordinate to the distribution of restitution to the other

victims.[1] Additionally, the presently effective judgments in both cases provide that "[t]he court will make a ruling regarding the distribution of restitution to National Credit Union Administration and to Northern Piedmont Federal Credit Union" and "that payment of restitution to Cumis Insurance Society, Inc. shall be subordinated to the restitution owed the other two victims."

For the following reasons, I find that restitution to Northern Piedmont takes priority, and that restitution to the NCUA is subordinated to Northern Piedmont's claim.

My reason for this finding, in short, is that the statute states that, "[i]f the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." 18 U.S.C. § 3664(i). The equities here favor Northern Piedmont, as its economic circumstances will be significantly aided by the recovery of these funds, whereas the NCUA does not face these kinds of economic circumstances.

### I.

Northern Piedmont was originally chartered in 1954 as Vint Hill Federal Credit Union ("VHFCU"), serving the military and civilian personnel working at Vint Hill Farms Station ("VHFS"), a United States Army and National Security Agency signals intelligence and electronic warfare facility located in Fauquier County, Virginia, near Warrenton. The 1993 Base

---

[1] Ms. Newcomb and Ms. Humphries were co-conspirators in an embezzlement scheme. At Ms. Humphries' sentencing, I stated that I would determine the distribution of restitution upon sentencing Ms. Newcomb. Additionally, I subsequently determined that these defendants' bear a joint and several obligation to pay restitution.

Realignment and Closure Commission recommended the closure of VHFS. VHFCU was renamed Northern Piedmont Federal Credit Union and, in 1995, its main office was moved to Culpeper, Virginia. Subsequently, the main office in Culpeper was sold as part of Northern Piedmont's concerted efforts to maintain financial viability after the losses it sustained as a victim of the fraud of the defendants in this criminal case. Today, Northern Piedmont's main office is located in Warrenton, Virginia, and it currently serves more than 200 employer groups in five counties.

Federal law restricts the kind of investments that a federal credit union can make. Therefore, to increase the earning power of available capital, federal credit unions sometimes engage in "loan participation agreements" with each other. These agreements typically allow one credit union that has available capital but low demand for loans from its members, and another credit union that has high demand for loans from its members but little available capital to combine their respective resources; the consequence is that the second credit union can meet its loan demand, and both credit unions can earn interest income generated by the loans.

Several years ago, the NCUA informed Northern Piedmont that its earnings were too low. The NCUA recommended that, to boost earnings, Northern Piedmont should enter into loan participation agreements with one or more other federal credit unions. Shortly thereafter, Northern Piedmont learned from its outside accountant auditor that Lynrocten Federal Credit Union ("Lynrocten") was interested in teaming with other credit unions on loan participation agreements.

After discussions with Lynrocten, negotiations, and due diligence, including reaching out to the CEO of another credit union that had entered into loan participation agreements with Lynrocten and experienced good results, Northern Piedmont signed the first of three loan

participation agreements with Lynrocten. Over the next couple of years, Northern Piedmont executed more agreements. Ultimately, Northern Piedmont wired over $3 million to Lynrocten. In May of 2013, Northern Piedmont learned that the NCUA was stepping in, that the dissolution of Lynrocten was occurring, and that the defendants in this criminal action were responsible for stealing enormous amounts of funds from Northern Piedmont, Lynrocten, and Lynrocten's members over the course of a number of years.

At the time of the dissolution, $1,695,793.24 in funds that Northern Piedmont had wired to Lynrocten in connection with the loan participation agreements had not been recovered. To date, Northern Piedmont has not recovered any of those funds. To retain its financial viability, Northern Piedmont's then-CEO took early retirement (so that Northern Piedmont would be relieved from paying her salary), it sold its main office in Culpeper, and it otherwise acted to preserve its financial health in the face of a serious financial blow for a credit union of Northern Piedmont's size. Of the $10,037,890.06 in loss that is included in the NCUA's victim claim, the NCUA states that its "Board has distributed over $9 million of cash from [the National Credit Union Share Insurance Fund ("NCUSIF") to] make depositors whole and to cover those losses and expenses caused by this criminal conduct," noting further that

> [t]he actual loss to [Lynrocten] is greater than the cash outlay of the NCUSIF because shareholder equity at [Lynrocten] offset a portion of the loss and the loss will be borne by unsecured creditors, such as Northern Piedmont[,] because there will not be assets from the [Lynrocten] estate with which to fully pay them.

As I have already stated, the NCUA requests, and the government recommends, that I order pro rata distribution of the restitution proceeds. Northern Piedmont asks that I decline to order pro rata distribution.

## II.

The restitution statute "gives sentencing courts significant flexibility to tailor restitution orders to particular circumstances." *United States v. Perry*, 360 F.3d 519, 535-36 (6th Cir. 2004). While the statute specifies that, "if the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim," 18 U.S.C. § 3664(i), it makes no mention of pro rata distribution; rather, pro rata distribution is accepted as "simply one alternative a court might adopt under the highly general and flexible grants of authority in 18 U.S.C. §§ 3664(f)(3)(A) and (i)," *Perry*, 360 F.3d at 536.

As set forth above, the crimes of the defendants inflicted a significant financial impact on Northern Piedmont, and the NCUA's economic circumstances stand in sharp contrast to Northern Piedmont's financial vulnerability. Indeed, in 2014 the NCUA itself classified Northern Piedmont as undercapitalized, and required that it submit a "net worth restoration plan." *See* 12 C.F.R. § 702.206 (describing net worth restoration plans). Northern Piedmont submitted a plan, which was approved in 2015, the aim of which is to establish appropriate capitalization, *i.e.*, Northern Piedmont's viability as a financial institution. The operation of the NCUA is not affected one way or the other, but establishing that Northern Piedmont's restitution claim takes priority may help resolve an impending threat to Northern Piedmont's survival.[2]

---

[2] In essence, the NCUA responds that, because Lynrocten has been liquidated, the NCUA's circumstances, as Lynrocten's liquidator, are much more dire than Northern Piedmont's. But Northern Piedmont is a still-existing financial institution, and Lynrocten is not. Lynrocten cannot and will not be resurrected. The damage has been done, and Lynrocten's members have moved on (and have been made whole, thanks to the NCUSIF). These facts favor priority of distribution to Northern Piedmont.

– 5 –

Case 6:14-cr-00001-NKM   Document 36   Filed 08/14/15   Page 5 of 6   Pageid#: 321

Therefore, I find that the equities here favor Northern Piedmont, as its economic circumstances will be significantly aided by the recovery of these funds.

## III.

Accordingly, I will enter amended judgments in the cases against Linda Sue Newcomb and Teresa Wieringo Humphries, reflecting that Northern Piedmont's restitution claim takes priority over the NCUA's subordinate claim, and this memorandum opinion will be attached to the amended judgments.

It is so **ORDERED**.

The Clerk of the Court is **DIRECTED** to send a certified copy of the amended judgments and this accompanying memorandum opinion to all counsel of record.

**ENTERED** this \_\_14th\_\_ day of August, 2015.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

– 6 –

Case 6:14-cr-00001-NKM   Document 36   Filed 08/14/15   Page 6 of 6   Pageid#: 322